Filed 1/13/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANDREW YOUNG,<br>    on Habeas Corpus. | A138266 |

In 1993, a jury convicted petitioner Andrew Young of the second degree murder of his former girlfriend, Dollie Harvey, in 1991. Petitioner brutally murdered Harvey during a period of extraordinary and prolonged stress caused by his loss of custody of a child from a previous relationship and after Harvey rejected his entreaty that they resume their relationship. Petitioner was sentenced to a term of 15 years to life. Now 53 years old, he has been considered for, and denied, parole by the Board of Parole Hearings (Board) on five occasions.

We uphold the Board's decision to deny parole if it reflects due consideration of all relevant statutory factors and is supported by at least a "modicum of evidence, not mere guesswork," that is rationally indicative of current dangerousness. (*In re Shaputis* (2011) 53 Cal.4th 192, 212, 219, 221 (*Shaputis II*).) In *In re Young* (2012) 204 Cal.App.4th 288 (*Young I*), we concluded the Board's October 2009 denial of parole to petitioner violated his due process rights because the Board: (1) did not duly consider his insights into the murder and several other relevant factors that demonstrated his suitability for parole, including the stressful circumstances petitioner experienced leading up to the crime and his exemplary postconviction conduct, (2) relied on mischaracterizations of evidence and conjecture, and (3) stated reasons for denial that were not supported by evidence rationally indicative of current dangerousness. We ordered the Board to conduct a new suitability hearing consistent with our decision.

1

Unfortunately, the Board has not done so. In July 2012, it held another hearing and arbitrarily denied petitioner parole again by committing the same errors as those we pointed out in *Young I*. Most significantly, the Board again did not duly consider petitioner's considerable insights into why he committed the murder or the extraordinary and prolonged stresses he experienced leading up to it. The Board's failure to do so is lamentable, not only in light of our discussion in *Young I*, but because the Board is required to duly consider these matters. Each is expressly defined by the governing regulation to be a relevant factor demonstrating suitability for parole.

Nonetheless, the Board mischaracterized petitioner's considerable insights and stresses as being about "other areas" of his life. This is patently incorrect, and impossible to conclude from even a cursory review of petitioner's statements. Petitioner repeatedly said that he killed Harvey because he was extremely overwhelmed with sadness, rejection, shame, and frustration from his prolonged, unsuccessful battle for custody of his son, his father's abandonment of him as a child, Harvey's refusal to resume their relationship, and his inability to seek help for his increasing emotional difficulties. As a result, a cycle of anger developed in him until he exploded into an uncontrollable rage towards Harvey. And petitioner unquestionably meant what he said; his postconviction conduct, including his efforts to seek help for, and address, his emotional difficulties and his uniformly exemplary prison behavior for almost two decades, is impressive. We can only conclude that the Board's vision was entirely obscured by the heinous nature of the crime itself. However, our Supreme Court has made clear that in such a circumstance, the heinous nature of the crime by itself is *not* sufficient to deny parole. (*In re Lawrence* (2008) 44 Cal.4th 1181, 1213-1214 (*Lawrence*).)

The Board also concluded that petitioner was a "domestic abuser" who had "relational dynamics" problems with intimate partners in general. There is no question that petitioner's murder of Harvey, by definition, was an act of domestic violence. But there is no evidence that petitioner ever engaged in any domestic or other abuse before or after the stressful circumstances that led up to the murder, or that he lacked relevant insights into his intimate relationships. An act of domestic violence does not make one a

2

serial domestic abuser or establish a propensity to commit acts of domestic violence. Nonetheless, the Board, having speculated that petitioner was such an abuser, concluded that he lacked insight into this purported attribute as well.

Finally, the Board, based on this conjectural attribute, dismissed without good reason petitioner's exemplary postconviction conduct. The Board reasoned that, because the danger petitioner might present to an intimate partner could not be assessed in prison, nothing he had done and nothing he could do in a prison setting would disprove his purported general tendency towards domestic violence. Thus, the Board, although also expressly required by regulation to duly consider petitioner's postconviction conduct as a suitability factor, disregarded it altogether.

In short, the Board's decision violated petitioner's due process rights to a decision based on the evidence, not conjecture, and on consideration of all relevant suitability factors. There is no evidence in the record rationally indicative of current dangerousness. To the contrary, all of the evidence, other than the heinous nature of the crime itself, indicates petitioner was suitable for parole. Accordingly, we grant the petition.

In *Young I*, we ordered the Board to conduct another hearing consistent with our opinion and with *In re Prather* (2010) 50 Cal.4th 238 (*Prather*). That remedy is insufficient here. The Board has failed to afford petitioner the hearing to which he is entitled, even after being ordered to do so. It has twice denied him parole by disregarding ample evidence of highly relevant suitability factors in favor of conjecture. Its latest reasoning leaves petitioner with little, if any, opportunity to establish that he is worthy of parole. Ordering it to conduct yet another hearing with the attendant delay will only prolong the denial of petitioner's constitutional rights. Therefore, we order the Board to vacate its denial and immediately grant petitioner parole, which grant shall be subject to review by the Governor.[1]

---

[1] Of course, the Board retains its power to rescind its grant of parole on an appropriate record based on events occurring after the 2012 hearing. (*In re Powell* (1988) 45 Cal.3d 894, 901-902; Pen. Code, §§ 3041.5, 3041.7; Cal. Code Regs., tit. 15, § 2450 (Regs.).)

## BACKGROUND

### *Petitioner's Murder Of Harvey*

The Board considered a 1993 probation report, which this court discussed at length in *Young I*, *supra*, 204 Cal.App.4th at pages 294-295. According to the report, in 1990 and the first part of 1991, petitioner, while living with Harvey in the Bay Area, engaged in a costly, emotionally trying, and unsuccessful custody battle in New York with the mother of his young son, a woman named Wynona Johnson. Johnson had, as petitioner put it, " 'kidnapped' " the boy, whom petitioner had been raising for several years, and taken him back to New York where she instituted custody proceedings. Petitioner told the probation department that he became more and more stressed as his financial, emotional, and work pressures mounted. He and Harvey began to argue and their relationship deteriorated. After Harvey learned that petitioner had spanked her son, they decided to end their relationship. Harvey moved into her own apartment and petitioner went to New York to visit his son for a month. The day after he returned, he met with Harvey. They went to her apartment, had a drink or two and some cocaine, and talked about money, the bills, the children, and their relationship. They started arguing and yelling. Harvey became afraid and picked up a knife. Petitioner caused her to drop it, and Harvey picked up a hammer. Petitioner took it from her, struck her with it repeatedly, and killed her.

A friend of petitioner's notified the police about petitioner's erratic, self-destructive conduct and Harvey's apparent disappearance. The police entered Harvey's apartment and discovered her body in the rear bedroom with a suitcase covering the head. Petitioner was soon arrested and acknowledged killing Harvey.

An autopsy of Harvey's body found 67 blunt force injuries and an abrasion on the neck. Forty-eight of the blunt force injuries were on the head and face. The cause of death was strangulation, blunt force head injuries, and blood loss.

At trial, petitioner admitted killing Harvey but argued he did so in the heat of passion and was guilty of only voluntary manslaughter. He was ultimately found guilty

4

of second degree murder and sentenced to an indeterminate life sentence. (*Young I*, *supra*, 204 Cal.App.4th at p. 294.)

### Petitioner's Prior History

Petitioner was born in New York City to parents who divorced when he was a boy. He graduated from high school and served honorably in the Marine Corps. He has a relatively modest, nonviolent criminal record, consisting of convictions for petty larceny and attempted possession of a weapon, and a similarly modest, nonviolent juvenile record.

According to petitioner, he met Harvey in New York in 1987. She relocated to the Bay Area with her own two children, and petitioner and his son joined them in 1989. They lived together until shortly before the 1991 murder, when Harvey and her children moved out. Petitioner was for the most part employed during this period, holding several different jobs. He was involved for about seven years with Johnson prior to his relationship with Harvey.

Psychologist M. Geca prepared a June 2012 evaluation of petitioner. She wrote that he had previously indicated he started using cannabis in high school and had "[c]onsistently over the years . . . indicated a . . . limited use" of it. Petitioner told Geca it had been his "drug of choice," he typically smoked no more than two marijuana joints a day, and he had gone to work under its influence "occasionally." He said he drank liquor occasionally and used cocaine twice, in 1990 when his son was taken back to New York and on the night he murdered Harvey.

### Petitioner's Postconviction Conduct

As of the 2012 hearing, petitioner had a very impressive record of postconviction conduct, including extensive rehabilitation activities. He had no disciplinary write-ups in over two decades of imprisonment and was assigned the lowest possible prisoner classification score available to him, demonstrating his exemplary conduct. A Board commissioner's summary of his many years of rehabilitation programming and self-help study takes up nine pages of hearing transcript. Petitioner's extensive prison programming included courses in anger management, parenting, domestic violence,

5

relapse prevention, emotional awareness, emotional maturity, alternatives to violence, literacy, sexual awareness, personality and morality, Alcoholics Anonymous and Criminon.

Petitioner also was a practicing Muslim since 1999. He had worked at a number of jobs, including the prison library for a number of years, and had above average to excellent work reports, was vocationally certified in machine shop, parenting, and mill and cabinet, and was participating in construction skills modules. He helped other inmates prepare for their GED. He was also taking community college courses. In 2004, he had promptly sought help for an injured kitchen cook, preventing her further injury. Letters from prison personnel described him as someone who was diligent, respectful, patient, positive in attitude, constructive, committed to helping others, and able to get along with staff and inmates regardless of ethnicity.

### Parole Plans And Social Support

Petitioner told the Board that, if paroled, he planned to live in transitional housing in the Sacramento area, having been accepted into a program there. After that, he planned to live in Sacramento with his brother. At the time of the hearing, he remained in contact with his parents and siblings. He had numerous letters of support, including from Johnson and their son, as well as from relatives and long-time friends.

### Prior Psychological Evaluations Of Petitioner

Petitioner received four positive psychological evaluations prior to 2012.[2] The evaluating psychologists concluded that he had a "less than average" potential for violence (1996); posed no "more than a normal risk factor whether in or out of a controlled environment" and was "an excellent candidate for parole" (2000); had a below-average risk of harm to others compared to the parolee population (2005); and presented a low risk of violence (2008). Petitioner was found to have "demonstrated a

---

[2] Petitioner cites to evaluations contained in the *Young I* record without objection from respondent. We construe petitioner's citations as an unopposed request for judicial notice, grant it, and consider these evaluations. (Evid. Code, § 452, subd. (d).)

fair insight into his own behavior" (1996); "normal" "judgment and insight" (2000); and "demonstrated at least average insight for an individual his age" (2008).

### *Geca's June 2012 Psychological Evaluation Of Petitioner*

In June 2012, Geca reviewed petitioner's file, interviewed him, conducted standardized tests, and prepared a comprehensive risk assessment of him. She wrote that petitioner had admitted culpability for the crime from the time he was arrested; expressed sadness, contrition, and remorse; did not project blame or responsibility upon the victim; had an exemplary prison record; and participated in an extensive amount of self-help programming.

Geca also wrote that petitioner had significant insights into the life crime. He said that his violent behavior was the result of "his inability to deal with his pent up anger"; the " 'kidnapping' [his term] of his son and the circumstances that followed fueled his angry feelings"; his emotional state at the time of the murder was like "a volcano and . . . his lack of communication with others and inability to seek help took a toll on him and led to his rage"; and he refused to leave Harvey's apartment when requested because " '[i]t was a sign of rejection.' " Geca also reported that his risk potential was very low according to two standardized tests, the LS/CMI (Level of Service Case Management Inventory) and PCL-R (Psychopathy Checklist-Revised).

However, Geca also criticized petitioner for his lack of insight into the life crime. This was the primary reason she gave him a mixed score on a third standardized test, the HCR-20 (historical, clinical, and risk management assessments). She thought that petitioner's "appreciation of the critical factors of this crime was still insufficient" in that petitioner "seemed to lack understanding of how stress in relationships impacted his behavior and increased impulsivity."

Geca's assertion that petitioner lacked sufficient insight into the life crime was based in part based on her diagnosis—alone among all of the psychological evaluators of petitioner—that he suffered from two Axis I disorders: cannabis abuse (provisionally) based on petitioner's report that it was his "drug of choice" and "Adult Antisocial Behavior" based on "his previous, however limited- [*sic*], criminal activities, use of illicit

7

drugs and commission of the life offense." She was concerned that petitioner, although he had "effectively managed his impulses" during his two decades of incarceration, would not be able to do so upon release because "there is no indication that he has experienced personal stressors of a similar magnitude" to those he had endured before his commission of the life crime.

In a two-paragraph conclusion section, Geca wrote without further explanation that petitioner *both* was a low risk of violence, without any need for specialized attention, *and*, if he wished to abstain from violence in the future, needed to gain further insights into "his interactions with the romantic partners."

### *The 2012 Board Hearing*

At the July 2012 Board hearing, the Board and petitioner discussed numerous matters relevant to his parole. These included petitioner's remorse, his insights into the life crime and his problematic behaviors; substance abuse and relapse prevention plan; criminal, military, and work history prior to the life crime; exemplary prison record; prison self-help programming; positive work evaluations; vocational certifications; parole plans; and letters of support.

As discussed in more detail below, petitioner expressed a great deal of remorse for taking Harvey's life and the pain he had caused to others. He said he alone was responsible for his thoughts and actions. He killed Harvey because he "was extremely overwhelmed . . . [¶] . . . [¶] with sadness, rejection, shame, frustration, and those things we're dealing with the court system regarding my son, the per se kidnapping of my son, the failure of myself not to address those issues." On the night of the murder, Harvey's wanting to end their relationship brought up many of these feelings, as well as his feelings of being rejected by his father as a child. His "rage" came from his failure to address the issues and problems in his life as they had accumulated. He had suppressed his problems, causing a cycle of anger that built up to the point that he lashed out uncontrollably.

Petitioner said he was no longer a threat to public safety because he had learned to ask for help when he needed it and to use resources available to him. He identified

8

"frustration" and "unhealthy relationships" (citing his previous relationship with Johnson) as "triggers" for him. He now knew how to recognize warning signs that he was becoming frustrated, to remove himself from a problem, reflect on his part in it, and then express himself in a "pro-social" way, rather than blaming and threatening.

The Board summarized Geca's report to petitioner. Petitioner said he was "nervous and scared" about being interviewed by Geca because she had "an extremely notorious reputation among inmates." Asked about Geca's concern about his using substances when under stress, petitioner said he would ask for help when he needed it, such as through Alcoholics Anonymous, Alternatives to Violence, or by calling a sponsor or his parole officer. Also, he said, his "spiritual foundation" would not allow him to use substances.

Petitioner's counsel and petitioner made final statements to the Board. At the beginning of the hearing, petitioner's counsel had objected to the Board's reliance on Geca's psychological evaluation, in part because of its "many inconsistencies." He repeated this objection in his closing remarks, contending Geca's evaluation contained so many errors that it was necessary to prepare a revised version, which he had just received that day. He said Geca seemed very frequently to be contradicting herself, such as by stating that petitioner had insight in one paragraph and then stating that he did not in another, which made her evaluation "perplexing on many different levels." Counsel said that in a March 2012 Board proceeding the commissioners had discounted Geca's evaluation of another inmate's insight because her evaluation contained numerous contradictions. He quoted a commissioner at that proceeding as saying, "We were somewhat taken aback in terms of Dr. Geca because she seemed and very frequently to be contradicting herself in terms of saying one thing in one paragraph and contradicting that thing in a previous paragraph. You had insight into the crime, and then you didn't have insight . . . ." Counsel also summarized petitioner's prior, positive psychological evaluations in 1996, 2000, 2005, and 2008.

In his closing remarks, petitioner said, among other things, he was a better person because he had addressed "those issues of abandonment, fear, rejection and shame" that

9

were "the core issues of my anger." He had learned to communicate his needs and concerns to others instead of suppressing them and allowing them to build up. He also had a support network of family and friends, resources and groups available to him, a strong spiritual foundation, and a commitment to remain clean and sober. He had taken the advice of past Board panels, worked extremely hard, and was suitable for parole.

Douglas Pipes, a Contra Costa County special deputy district attorney, and Alonda Duvall, Harvey's daughter, spoke against granting petitioner parole. Pipes referred to an April 2012 life prisoner evaluation report, in which petitioner affirmed his July 2000 account of the life crime. In that account, Pipes said, petitioner indicated he did not understand his actions in killing Harvey. Pipes also said the autopsist's report indicated that petitioner used a ligature to strangle Harvey.[3]

Duvall told the Board it was "never really mentioned" that petitioner's relationship with Harvey ended because petitioner had dislocated the clavicle of Harvey's son (Duvall's brother), Akeem, who was four or five years old in 1991. This caused her mother to end the relationship and move out.

### The Board's Decision

The Board found petitioner unsuitable for parole. Presiding Commissioner Anderson and Deputy Commissioner Alvord explained this decision.

Anderson stated that the Board had reviewed all relevant information and weighed the considerations provided in title 15 of the California Code of Regulations. The Board's "first consideration" that "weigh[ed] heavily against suitability" was petitioner's "past/present mental state and attitude" towards such a "heinous and atrocious" life crime. This included petitioner mutilating his victim, an unsuitability factor. (Regs., § 2402, subd. (c)(1)(C).) Anderson referred to petitioner's account of the crime in 2000, affirmed by petitioner in 2012, in which petitioner accepted responsibility for the murder but stated that he did not understand his actions. Anderson asked, "Now, can we put an

---

[3] None of these documents referred to by Pipes are contained in the record.

10

individual back in the community who is going to interact with the females that does not understand his actions[?]."

Anderson discussed Geca's conclusions that petitioner lacked insights into the life crime, such as that petitioner, while he had "some" understanding of his anger, continued to struggle with its "progressive cycle" and could not explain why it escalated to such violence against Harvey; that petitioner's insight "into his situation, his anti-social behavior and potential impact on others has been progressively greater, but it's still not sufficient;" and that, "[a]lthough the exploration of this matter may prove very difficult for [petitioner], . . . it's critical, especially if he wishes to understand the internal factors of this crime and wants to develop effective preventive strategies for the future." Anderson concluded that petitioner lacked insight "into the internal dynamics of a relationship with Ms. Harvey," which insight was necessary "before he's no longer an unreasonable risk of danger to society." He acknowledged Geca's conclusion that petitioner was "a low risk to recidivate." However, he said, "the issue of not understanding of life crime outweighs that risk designation."

Anderson referred to petitioner's "excellent programming" while in prison, but then said "the real reason [petitioner's] in prison is not his excellent programming. The real reason he's in prison, it's not all the good he's done. It's the bad he's done, the fact that he got convicted by a court of law of a heinous and atrocious crime of killing Ms. Harvey, and he doesn't understand why he did it. He has insight into other areas, but he has no insight into this area, and that is a concern of this Panel." After quoting petitioner's statements in his recent letter to his father that "ever since that day in 1991, when I lost my mind, I've been asking myself . . . [w]here did all that anger come from" and "I have … really, just begun to understand that all of my feelings and emotions affect each other," Anderson said, "He's had tons of self-help programs, but he can't say where did that anger come from . . . ." Also, "despite his participation in many programs and a completion of a plethora of self-study material, he lacks a comprehensive understanding of his crime. . . . He has insight in other areas, but into the causative factors of his

11

conduct, he is lacking." At the conclusion of his remarks, Anderson acknowledged that petitioner's parole plans were "exceptional."

Alvord addressed petitioner's institutional adjustment. He noted petitioner's exemplary postconviction conduct, including his prompt actions to help the injured prison cook in 2004, the absence of disciplinary actions against him, his vocational certifications, extensive self-help programming, and religiosity, and the fact that he was 50 years old. However, Alvord asserted, petitioner's life crime "involved domestic violence." Such cases were "the hardest cases that we deal with because by and large, people that commit domestic violence do well in the institution." Alvord dismissed petitioner's exemplary prison disciplinary record because in his experience, it was "very rare" that "domestic abusers . . . have problems in the institution." He said, "They tend to just flourish . . . and . . . we think that part of that is because you don't have relationships within the institution with those types of persons who could become your victim, i.e., spouses, children, things of that nature, and I'm not saying that's your case. I'm just saying that that tends to be the case."

Alvord thought petitioner had "made significant strides," but was "not there." There was "a monster" inside petitioner that was 'very dangerous," Alvord said, and petitioner had "yet to come to grips with" it. To say the life crime was "a result of anger" was "almost an oxymoron [*sic*] when you're talking about murders," Alvord said. He referred to petitioner's striking Harvey's child and developing an "incredible rage" when Harvey wanted to break up with him. He continued, "[V]ery few people go into rages like you went into and did this incredible violence over something such as that. . . . You don't see it . . . . You have done well. And you're gaining insight. You're working hard. That's obvious to us, but you don't quite get it. It's not enough to say, 'I was angry.' You need to understand why you're angry and how that anger translates into doing something like this to people who are so vulnerable. You don't do that to people out here on the yard. You do it to vulnerable people on the outside that you're in a relationship with, and there's no way for us to test that. . . . So what we have [to] do is go with our gut feeling, our perception of you, the psychological evaluation and what we see and

hear.  And . . .  everything we've seen here today makes us, frankly, both feel very uncomfortable about you being out on the street.  We're very convinced that you're still dangerous, and I think you're getting there."

The Board scheduled petitioner's next parole review in three years because of his positive programming, stable social history, and good conduct in prison.

### *The Present Proceedings*

Petitioner filed his petition in propria persona in April 2013.  We subsequently ordered the Director of the Department of Corrections and Rehabilitation to show cause why the relief requested in the petition should not be granted.  Gary Swarthout, Warden of the California State Prison, Solano, filed a return opposing the petition.  Petitioner, through counsel, filed a denial and traverse.

## DISCUSSION

By ordering the Board to conduct a new hearing consistent with our opinion in *Young I*, we required it to consider all relevant factors and the entire record, and to avoid conjecture in determining whether petitioner was suitable for parole.  The 2012 Board did not do so.  Faced with evidence of a heinous and atrocious life crime, the Board disregarded petitioner's considerable insights into the stress that led up to it.  Instead, it conjectured that he was an uninsightful "domestic abuser."  Based on these arbitrary determinations, it disregarded altogether petitioner's exemplary postconviction conduct.  We conclude there is no evidence rationally indicative of current dangerousness.  To the contrary*,* all of the evidence, other than the heinous nature of the crime itself, indicates petitioner was suitable for parole.

### I.  *General Legal Standards*

The state may not deprive any person of life, liberty, or property without due process of law.  (U.S. Const., 14th Amend., § 1, Cal. Const., art. I, § 7.)  As we discussed in *Young I* and more recent cases, such as *In re Morganti* (2012) 204 Cal.App.4th 904 (*Morganti*) and *In re Stoneroad* (2013) 215 Cal.App.4th 596 (*Stoneroad*), the Board's parole authority is governed by a body of statutes and regulations as mandated by the Legislature, most notably Penal Code section 3041 (section 3041) and title 15,

13

section 2402, of the California Code of Regulations (Regulations). Section 3041 mandates that the Board " ' "normally" ' " set a parole date for an eligible inmate, and " 'must' " do so unless it determines that an inmate poses a current threat to public safety. (*Prather*, *supra*, 50 Cal.4th at p. 249, quoting *Lawrence*, *supra*, 44 Cal.4th at p. 1202.) As a result, parole applicants have a "due process liberty interest in parole" and " 'an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' " (*Lawrence*, at pp. 1191, 1204, quoting *In re Rosenkrantz* (2002) 29 Cal.4th 616, 654 (*Rosenkrantz*).)

The Board must, consistent with due process, answer the "essential question" of "whether the inmate currently poses a threat to public safety" by conducting "an individualized inquiry into the inmate's suitability for parole," "draw[ing] . . . answers from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior." (*Shaputis II*, *supra*, 53 Cal.4th at pp. 219-221.) It is required to give due consideration to the criteria referred to in section 3041 and, more specifically, in Regulations, section 2402, promulgated by the Board pursuant to legislative mandate.[4] (*Prather*, *supra*, 50 Cal.4th at p. 251 [Board "*must* consider the statutory factors concerning parole suitability set forth in section 3041 as well as the Board regulations," italics added].)

Regulations, section 2402 states, "[a]ll relevant, reliable information available to the [Board] shall be considered in determining suitability for parole." (Regs., § 2402, subd. (b).) It contains numerous factors regarding both an inmate's unsuitability[5] and

---

[4] Penal Code section 3041, subdivision (a) provides, "The [B]oard shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime."

[5] Unsuitability factors are: a commitment offense carried out in an "especially heinous, atrocious or cruel manner," including because there were "[m]ultiple victims"; the offense was carried out in a "dispassionate and calculated manner"; the victim was "abused, defiled or mutilated"; the offense was carried out "in a manner which

14

suitability[6] for parole that the Board *must* consider and rely on to assess whether the inmate poses "an unreasonable risk of danger to society if released from prison." (Regs., § 2402, subds. (a), (c), (d).) These "matrix of factors . . . contemplates that even those who committed aggravated murder may be paroled after serving a sufficiently long term if the Board determines that evidence of postconviction rehabilitation indicates they no longer pose a threat to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1211.)

We review the Board's decision under a "highly deferential 'some evidence' standard." (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.) We uphold the Board's decision that a petitioner is currently dangerous if it meets the "two basic imperatives" (*Young I*, *supra*, 204 Cal.App.4th at pp. 292-293) of due process: it must reflect due consideration of all relevant statutory factors and be supported by at least a "modicum of evidence, not mere guesswork." (*Shaputis II*, *supra*, at pp. 212, 219, 221.) Under this highly deferential standard of review, "[t]he reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence." (*Id*. at p. 221.)

Nonetheless, we "examine[] the *rationality* of the parole authority's decision, an inquiry that properly focuses on the authority's reasoning, including the evidence cited by

---

demonstrates an exceptionally callous disregard for human suffering"; or the motive for the crime was "inexplicable or very trivial in relation to the offense." (Regs., § 2402, subd. (c)(1)(A)-(E).) Other unsuitability factors are a previous history of violence; "a history of unstable or tumultuous relationships with others"; sadistic sexual offenses; "a lengthy history of severe mental problems related to the offense"; and "serious misconduct in prison or jail." (Regs., § 2402, subd. (c)(2)-(6).)

[6] Suitability factors are: the absence of a juvenile record; "reasonably stable relationships with others"; signs of remorse; a crime committed "as the result of significant stress in [the prisoner's] life"; battered woman syndrome; the lack of "any significant history of violent crime"; the prisoner's age reduces the probability of recidivism; realistic plans for release or marketable skills that can be put to use upon release; and institutional activities that "indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(1)-(9).)

the authority in support of its reasoning." (*Shaputis II*, *supra*, 53 Cal.4th at p. 225 (conc. opn. of Liu, J.).) Further, we focus upon " 'some evidence' supporting the core statutory determination that a prisoner *remains a current threat to public safety*—not merely 'some evidence' supporting the Board's . . . characterization of facts contained in the record." (*Prather*, *supra*, 50 Cal.4th at pp. 251-252, italics added.) "[T]he aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1214.)

## II. *The Board's Arbitrary Decision*

### A. *The Board Did Not Duly Consider Petitioner's Insights And Stress.*

Petitioner contends the Board violated his due process rights because, among other things, it ignored both his insights into his life crime and the stressful events in his life that preceded his commission of it. We agree. Although "the Board need not recite every factor it considers in a parole hearing, particularly those it finds unpersuasive" (*In re Scott* (2004) 119 Cal.App.4th 871, 898 (*Scott I*)), its decision affirmatively indicates that, as in 2009, it did not duly consider petitioner's considerable insights or the stress that led up to the life crime, each of which constitutes a highly relevant suitability factor.

In *Shaputis II*, our Supreme Court reaffirmed that the Board may deny a petitioner parole for "lack of insight." (*Shaputis II*, *supra*, 53 Cal.4th at p. 218.) Also, "an inmate's insight into other aspects of his or her personal history relating to future criminality" is a relevant consideration in determining parole suitability. (*Id*. at p. 220.) The Board should consider each inmate's statement of insight, mindful that " 'expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior.' " (*Id*. at p. 219, fn. 12, quoting *In re Shaputis* (2008) 44 Cal.4th 1241, 1260, fn. 18 (*Shaputis I*).)

16

The *Shaputis II* court emphasized "that lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness." (*Shaputis II*, *supra*, 53 Cal.4th at p. 219.) Courts "may properly be skeptical of stated reasons [by the Board] that appear to be unsupported by the record." (*Id*. at p. 218.)

The Board, as it did in 2009, concluded that petitioner had no insight into the life crime despite his repeated and undisputed explanations why he committed it and his extensive efforts to address the problems he recognized. Petitioner said he killed Harvey because he "was extremely overwhelmed . . . [¶] . . . [¶] with sadness, rejection, shame, frustration, and those things we're dealing with the court system regarding my son, the per se kidnapping of my son, the failure of myself not to address those issues." It was, he said, "a case of transferred anger. I realize now that . . . [Harvey] did nothing wrong, but she rejected me at that time and all of those feelings, everything accumulated to that point." When Harvey asked him to leave her apartment, "all of those feelings of the rejection, the shame, the guilt, all of those things came, and at that time, I was ill equipped to handle all of those things." Harvey's wanting to end their relationship brought up "so many emotions, and it all goes back to me feeling rejected from my father, and then after that, the sadness of my son being taken away from me, then the fear of not knowing how to deal with those situations . . . ."

Petitioner also discussed his insights into the rage he exhibited in committing the life crime. He said it came from his failure "to address the issues and the problems in my life . . . as they accumulated," and acknowledged, "I didn't take care of this problem. I didn't take care of this problem or in my perception was that I couldn't take care of it. I didn't have any avenues, and so it all accumulated, and the inner feelings was just resentment, rejection and shame."

Asked why he no longer threatened public safety, petitioner said he had in the past "suppressed the problems," which became "a cycle of anger" and built up to the point that "when you get mad or upset, that's when you lash out, and it's uncontrollable." He had learned to ask for help and use resources. He identified "frustration" and "unhealthy

17

relationships" as "triggers" for him. Asked what tools he now used to make sure these were not factors in his life, he said that when he felt himself getting frustrated and noticed warning signs, he would remove himself from the situation, consider how he was contributing to the conflict "and express my feelings in a pro-social way instead of blaming or threatening." The record indicates that petitioner's extensive prison programming has focused on issues he identified.

As we have discussed, Geca wrote that petitioner stated many of these insights to her as well. Petitioner told her his violent behavior was the result of "his inability to deal with his pent up anger." The " 'kidnapping' [his term] of his son and the circumstances that followed fueled his angry feelings." He compared his emotional state at the time of the murder "to a volcano and believed that his lack of communication with others and inability to seek help took a toll on him and led to his rage." Petitioner also acknowledged that on the night of the murder he refused to leave the victim's residence when requested because " '[i]t was a sign of rejection.' "

There was also evidence that petitioner "committed his crime as the result of significant stress in his life," that had built up over a long period of time—another suitability factor that the Board was required to consider. (Regs., § 2402, subd. (d)(4); *Lawrence*, *supra*, 44 Cal.4th at p. 1225 ["the existence of emotional stress as a mitigating factor favoring suitability is not dependent upon a degree of stress that would fully negate culpability for murder"].) No one disputes that in the year prior to petitioner's commission of the life crime, he was severely stressed by a prolonged custody battle regarding his son. Petitioner had cared for the boy for several years when the boy disappeared, having been taken back to New York suddenly and without petitioner's permission by Johnson, the boy's mother. Petitioner then engaged in an expensive legal battle that dominated his life, and which he ultimately lost. He consistently identified the stress of this unsuccessful battle, including his anger and grief over losing his son, the attendant disruption to his life, the extraordinary monetary cost of the custody battle, and the feelings of anger, rejection, shame, and guilt that accumulated within him, as well as his inability to seek help to deal with his accumulating emotions, as the major reasons

18

why he exploded like a "volcano" and killed Harvey when she too rejected him on the night of the murder.

Yet, although there is no dispute that petitioner's insights were genuine and meaningful and his stress was real, the Board's decision affirmatively indicates it ignored them. As indicated by Anderson's remarks, it did so by a simple, but very significant, mischaracterization of them all as being about "other areas" than the life crime. Said Anderson, petitioner "has insight in other areas, but he has no insight into [the life crime], and that is a concern of this Panel." Inexplicably, Anderson referred to petitioner's characterization of his emotional state at the time of the life crime as a volcano because of his inability to seek help, and then stated, petitioner "doesn't understand why Ms. Harvey was killed in the manner that she was" or know why he strangled Harvey.

Respondent contends that the Board did not ignore petitioner's insights and that petitioner improperly requests that we reweigh the evidence. We disagree. The Board's decision affirmatively indicates it ignored petitioner's stated insights, which were considerable, and ignored the stresses he experienced leading up to his commission of the life crime. Despite petitioner's lengthy discussion of these matters before the Board and with Geca, Anderson stated that petitioner "[did] not understand his actions," had "no insight" into the life crime, could not explain why his anger had escalated to such violence against Harvey, and lacked insight "into the internal dynamics of a relationship with Ms. Harvey." He said petitioner's "not understanding of life crime" outweighed Geca's "low risk" designation and, after referring to petitioner's letter to his father, that petitioner "can't say where did that anger come from." Similarly, Alvord said, as if petitioner had not stated any insights into the life crime, "The question is why you developed this incredible rage when a woman says she's breaking up with you."

Having turned a blind eye to petitioner's insights and stress, the Board concluded he lacked insight into the life crime. This was improper. The Board determines whether an inmate is currently dangerous by "draw[ing] . . . answers from the entire record, including . . . the insight he or she has achieved into past behavior." (*Shaputis II*, *supra*, 53 Cal.4th at p. 221.) It cannot simply ignore undisputed, material evidence of

19

petitioner's relevant insights and stress. (See *In re Denham* (2012) 211 Cal.App.4th 702, 716 [our Third Division stating that a Board's " 'mere refusal to accept . . . evidence [of understanding and remorse] is not itself a rational or sufficient basis upon which to conclude that the inmate lacks insight' "]; *In re Moses* (2010) 182 Cal.App.4th 1279, 1308 (*Moses*) [this court holding that "[t]he Governor cannot simply ignore the undisputed evidence of Moses's taking responsibility and repeated expressing of remorse"].)

The Board's failure to duly consider petitioner's insights and stress, as well as his postconviction conduct, which we will shortly discuss, is both surprising and disappointing in light of our conclusion in *Young I* that the 2009 Board ignored these same factors, among others. (*Young I*, *supra*, 204 Cal.App.4th at p. 305.) The requirement that the Board give due consideration to *all* relevant factors lies at the very heart of petitioner's constitutional right to due process. As we stated in *Young I*, " 'It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate* to support a conclusion of *current* dangerousness to the public.' (*Lawrence*, [*supra*, 44 Cal.4th] at p. 1212, italics added.) The Board 'must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the *full* record.' (*Prather*, *supra*, 50 Cal.4th at p. 255, italics added.)" (*Young I*, at p. 303.) Once more, as in *Stoneroad*, "[o]ur concern is not that the Board accorded insufficient weight to the foregoing relevant factors—an evaluation outside the scope of our review— but that it did not duly consider them in the first place, as its regulations require (Regs., § 2402, subd. (b)), and its [d]ecision provides no rational justification for the failure to do so." (*Stoneroad*, *supra*, 215 Cal.App.4th at p. 624.) In *Stoneroad*, "the Board's failure to comment on applicable suitability factors represent[ed] not just a failure to undertake the 'individualized consideration of all relevant factors' mandated by the Supreme Court more than a decade ago (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 655), but offend[ed] its own regulations." (*Ibid.*) Similarly, the Board's failure to duly consider any one of the

20

relevant suitability factors it ignored or, in the case of petitioner's insights into the life crime, mischaracterized and improperly cast aside, is reason alone to grant the petition.

**B. *There Is No Evidence That Petitioner Lacked Insight Into A General "Domestic Abuse" Problem.***

The Board not only mischaracterized petitioner's insights and then concluded that he had none relating to the life crime. Based on the nature of the crime, Geca's evaluation, and the Board's own "gut feeling," it also concluded that petitioner was a dangerous "domestic abuser" who lacked insight into his relational dynamics with women in general. There is no evidence to support this conclusion.

By definition, petitioner's murder of Harvey was an act of domestic violence. (See, e.g., Pen. Code, § 13700, subd. (b) [defining "domestic violence" as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship"].) However, petitioner demonstrated considerable insights into his relationship with Harvey, indicating, for example, that their relationship deteriorated because of the stresses he mishandled; that he, not she, was at fault for the escalation of their argument on the night of the murder; and that her rejection of him, on top of all the other negative emotions he had accumulated, caused his volcanic explosion and loss of control. He showed by his exemplary postconviction conduct that he acted on these insights to seek help, gain additional insights, and learn effective strategies to control his emotions.

Moreover, one act of domestic violence does not establish that a person is generally a "domestic abuser." The latter requires a pattern of behavior, for which the Board would be justified in wanting insights. (See *Shaputis II*, *supra*, 53 Cal.4th at p. 219, fn. 12 [referring to a prisoner gaining insight into " 'a previous *pattern* of violent behavior,' " italics added].) However, there is no evidence that petitioner ever engaged in a pattern of domestic or other abuse before or after the stressful circumstances that led

21

up to the murder.[7]  The record shows that petitioner committed only one other violent act, against Harvey's son, that led to Harvey's breakup with him.  It occurred in the midst of the extraordinary stress petitioner was experiencing.

Despite this lack of evidence, the Board reified petitioner's conduct in murdering Harvey into the attribute of a "domestic abuser,"[8] and then found he lacked insight into this factually unsupported attribute.  As Anderson described it, petitioner's problem was with *all* women: "Now," he said, "can we put an individual back in the community who is going to interact *with the females* that does not understand his actions[?]."  (Italics added.)  Alvord similarly categorized petitioner as a "domestic abuser" who abused "vulnerable people on the outside that you're in a relationship with."

The Board did cite to certain parts of Geca's evaluation for its conclusion that petitioner lacked insights, including into his relationships with intimate partners in general.  However, this evaluation was not reliable evidence because of Geca's inexplicably contradictory conclusions that petitioner *did* and *did not* have insights into the life crime, and *was* and *was not* a risk to commit violence in the future.

Specifically, Geca, in discussing petitioner's insights into the life crime, concluded that he "was aware that his anger was cumulative," that at the time of the murder he had "lacked skills to address it as it came up" and that he "knew his triggers, warning signs

---

[7]  While it is not conclusive on the subject, it is worth noting that Johnson, the only other girlfriend of petitioner's identified in the record, as well as their son, now an adult, submitted letters in support of his parole.

[8]  As discussed by the psychiatric and legal scholar Bernard L. Diamond, the danger exists that the criminal action or behavior for which a person is imprisoned will become "translated into an attribute of the person," or "reified."  (Diamond, *The Psychiatric Prediction of Dangerousness* (1975) 123 U.Pa.L.Rev. 439, 449.)  Diamond explained, "For example, stealing is an action.  To label a man who steals as a thief is to reify the action into an attribute.  It implies that the man will continue to steal no matter what the situation, and that his thieving behavior is a consequence only of factors within him. . . .  Although it may be convenient to label persons, to reify behavior into attributes, and thus to predict future conduct, it must be recognized that such a process has no scientific or logical basis and that there is no reason to expect that such predictions will come true."  (*Ibid*.)

and ways to address his angry emotions." She then asserted the opposite, concluding that petitioner "did not know why his anger escalated that evening. He seemed to be aware of the external triggers of his anger (i.e., she argued; she took a knife; she grabbed a hammer), but he could not articulate the internal triggers of his rage"; and he "seemed to lack understanding of how stress in relationships impacted his behavior and increased impulsivity."

Geca also stated diametrically opposite conclusions about petitioner's risk of violence in her conclusion section. In the first paragraph, she stated that that petitioner was a "**low**" risk of violence without any need for specialized attention. In the second paragraph, she stated that petitioner, if he wished to abstain from violence in the future, needed to gain further insights into "his interactions with the romantic partners."

The Board should not have relied on any part of Geca's confused and contradictory conclusions. Regulations, section 2402 states that the Board is to consider all "reliable" information. (Regs., § 2402, subd. (b).) "[T]he exceedingly deferential nature of the 'some evidence' standard does not convert us ' "into a potted plant." ' (*Lawrence*, *supra*, 44 Cal.4th at p. 1212, quoting [S*cott I*, *supra*, 119 Cal.App.4th at p. 898].) We must ensure that the denial of parole is based on 'some evidence' of current dangerousness. '[S]uch evidence " 'must have some indicia of reliability.' " ' (*Scott I*, at p. 899.)" (*Moses*, *supra*, 182 Cal.App.4th at p. 1300.) Geca's conclusions are not reliable because of their internal inconsistencies regarding the fundamental issues of petitioner's insights and risk of violence. The Board ignored these inconsistencies despite petitioner's counsel's reference to them and his report that Geca had recently submitted so confusing an evaluation of another inmate's insight that another panel was, in one commissioner's words, "somewhat taken aback." Because of the inconsistencies in Geca's conclusions about petitioner's insights and risk of violence, it cannot be determined what she concluded. To rely on one or the other of her conclusions is an arbitrary choice. Therefore, the Board should not have relied on any of them.

In short, the Board's conclusion that petitioner was, in general, a "domestic abuser" was unsupported by any reliable evidence. As we will now discuss, the Board

23

then dismissed petitioner's exemplary postconviction conduct because, in the Board's view, it did not, and could not, demonstrate that he no longer had this hypothetical attribute.

## C. *The Board Did Not Duly Consider Petitioner's Postconviction Conduct.*

Based on petitioner's purported lack of insight into the life crime and his general "domestic abuse" problem, the Board then found his exemplary postconviction conduct, including his extensive rehabilitation activities, irrelevant. This too was improper.

Specifically, Anderson stated, "Do we really want to take an individual who is stellar in other areas of his life, but the real reason he's in prison is not his excellent programming. The real reason he's in prison, it's not all the good he's done. It's the bad he's done, the fact that he got convicted in a court of law of a heinous and atrocious crime of killing Ms. Harvey, and he doesn't understand why he did it."

Alvord dismissed petitioner's exemplary prison disciplinary record because it was "very rare" that "domestic abusers . . . have problems in the institution." He contended that petitioner had no insights into his tendency to abuse "vulnerable people." He acknowledged, then immediately discounted, petitioner's having "done well" in prison because "there's no way for us to test" petitioner for this tendency, since "[w]e can't bring somebody in here and see how you get along. So what we have [to] do is go with our gut feeling, our perception of you, the psychological evaluation and what we see and hear."[9]

---

[9] Geca similarly discounted petitioner's exemplary postconviction conduct because he had not experienced "personal stressors" in prison of a "similar magnitude" to those he had experienced leading up to the life crime. She in effect turned a suitability factor, the stressful circumstances leading up to the life crime, into a reason to deny parole, treated petitioner's exemplary postconviction conduct as meaningless to the evaluation of his current dangerousness and ignored the obvious stresses of serving a prolonged prison term. It would be improper for the Board to rely on her analysis, given the Board's mandate to consider an inmate's stressful pre-crime circumstances and positive postconviction conduct as parole suitability—not unsuitability—factors. Since the Board did not cite this part of Geca's evaluation as a basis for its decision, we will not discuss it further.

24

An inmate's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(9).) Indeed, consideration of postconviction conduct is an essential part of a Board's evaluation of whether a prisoner is currently dangerous. As our Supreme Court held in *Lawrence*, "when evaluating whether an inmate continues to pose a threat to public safety, . . . the Board . . . must consider . . . postconviction conduct and rehabilitation. [Citation.] Indeed, in directing the Board to consider the statutory factors relevant to suitability, many of which relate to postconviction conduct and rehabilitation, . . . it is evident that the Legislature considered the passage of time—and the attendant changes in a prisoner's maturity, understanding, and mental state—to be highly probative to the determination of current dangerousness." (*Lawrence*, *supra*, 44 Cal.4th at pp. 1219-1220; *Shaputis I*, *supra*, 44 Cal.4th at pp. 1254-1255; see also *Stoneroad*, *supra*, 215 Cal.App.4th at pp. 623-624 [criticizing the Board for ignoring petitioner's exemplary prison record and extensive rehabilitative programming].)

As Anderson and Alvord acknowledged, petitioner had an exemplary disciplinary record, an abiding religious faith, excellent marketable skills, and had engaged in extensive rehabilitation programming and self-help study. Alvord's summary of petitioner's rehabilitation activities takes up nine pages of the hearing transcript, and includes petitioner's successful years of participation in Alcoholics Anonymous, anger management, parenting, literacy, vocational, religious, education and other programs, as well as his positive work reviews. Alvord acknowledged these activities in his comments about the decision, commending petitioner for his "excellent marketable skills" and extensive program participation.

Nonetheless, the Board dismissed these many years of exemplary conduct entirely. Certainly, it may assign more weight to such things as a lack of insight than to an inmate's exemplary postconviction conduct; that is not ours to judge. However, the Board must do so upon consideration of all relevant suitability factors and evidence. Contrary to Alvord's "gut feeling" that petitioner was still dangerous, the Board's

25

"decisions must be supported by some *evidence*, not merely by a hunch or intuition." (*Lawrence*, *supra*, 44 Cal.4th at p. 1213.)  Its disregard of petitioner's exemplary postconviction conduct was the last piece in its construction of an arbitrary denial.

Even worse, Alvord indicated that petitioner could do nothing in prison to demonstrate that he was not a "domestic abuser" because he could not be "tested" there. In other words, the Board did not, and suggested it will not, duly consider petitioner's postconviction conduct in light of a factually unfounded attribute supported only by the immutable nature of his crime.  This approach is also improper.  Again, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." (*Lawrence*, *supra*, 44 Cal.4th at p. 1214.)  As we will now discuss, the record indicates only the opposite:  no evidence exists that is rationally indicative of current dangerousness.

**D.  *There Is No Evidence Of A Lack Of Insight That Is Rationally Indicative Of Current Dangerousness.***

There is no rational nexus between the remainder of the evidence before the Board and its determination that petitioner lacked insights such that he was currently dangerous. Viewed together, nothing in petitioner's record, hearing testimony or the previous psychological evaluations of him is rationally indicative of current dangerousness.  This leaves the two other documents referred to by the Board in its decision, petitioner's 2012 letter to his father that he was just beginning to understand how all his emotions affected each other and his 2012 affirmation of his 2000 statement, in which he indicated that he did not know why he killed Harvey.

These documents, when viewed, as they must be, in light of the entire record, are not rationally indicative of current dangerousness.  Petitioner's statements at the 2012 hearing and to Geca unquestionably showed he had insights into why he killed Harvey

26

and had engaged in extensive activities to address the problems he identified. To ignore them, while emphasizing petitioner's general reference to his feelings in a letter to his father or his general affirmation of a statement about the crime that he made 12 years before, is to condemn him for his inarticulateness, not his lack of insight.[10] This is improper. (See *In re Roderick* (2007) 154 Cal.App.4th 242, 270-271 [our Division Four reversing a denial of parole where, despite "his inability to articulate a more insightful explanation," the inmate expressed genuine remorse for the crime and acknowledged that he intentionally stabbed the victim, unlike his previous self-defense claims].)

In short, there is no evidence that petitioner failed to take full responsibility for the life crime or lacked remorse, that his insights did not account for why he killed Harvey in particular and in such a violent manner, that he ignored that her rejection of their relationship was a factor in the murder, or that he had a pattern of domestic violence that preceded the stressful events that led to his commission of the life crime. This lack of evidence distinguishes petitioner's circumstances from those discussed in the cases respondent argues support denial of the petition. (See *Shaputis II*, *supra*, 53 Cal.4th at pp. 204, 214 [petitioner's general recognition of his moral deficiencies and alcohol abuse insufficient in light of his "entrenched pattern" of domestic violence]; *In re Shigemura* (2012) 210 Cal.App.4th 440, 445, 457 [some evidence supported parole denial because the inmate's "rationalization of and detachment from her role in [the victim's] death" indicated that she "lacks insight into important aspects of how, from an emotional perspective, she participated in the murder"]; *In re Stevenson* (2013) 213 Cal.App.4th 841, 870-871 [inmate's rationalization and minimization of his wife's recent criminal conduct provided some evidence that he lacked the insight necessary to avoid committing additional antisocial acts].)

---

[10] Alvord spoke positively about petitioner continuing to explore his feelings and emotions, as petitioner indicated in his letter to his father, while finding this indicated that petitioner still lacked insight into the life crime. Petitioner's continued exploration into his feelings does not mean he lacks insights into the life crime. The Board appears to have confused the two.

Even if we were to assume for the sake of argument that petitioner lacked some insights into his "relational dynamics" and the manner in which he murdered Harvey, there is not a rational nexus between the evidence and the conclusion that petitioner is currently dangerous. Petitioner committed a heinous and atrocious crime, but the record indicates only that his conduct prior to the stresses that led up to it and afterwards has been nonviolent and, during his prison term, exemplary. His acceptance of responsibility for, and considerable insights into, the life crime; his remorse; exemplary disciplinary prison record; years of excellent programming; religious faith; multiple positive psychological evaluations prior to Geca's evaluation; excellent marketable skills; exceptional parole plans; prior history; and extensive support network do not establish any likelihood he would present a risk to public safety if released on parole. They are rationally indicative only of suitability for parole, not unsuitability. (See *Morganti*, *supra*, 204 Cal.App.4th at p. 925.)

In light of our conclusions, we do not discuss the remainder of petitioner's arguments.

### III. *Remedy*

Having determined that we must grant the petition, we also must address what is an appropriate remedy to the Board's repeated violations of petitioner's due process rights. Petitioner asks that we release him immediately or, in the alternative, that we order the Board to conduct a new suitability hearing pursuant to *Prather*. Respondent does not address the issue.

If the Board's consideration of the specified factors is not supported by some evidence in the record, we must grant the petition and order the Board to vacate its petition. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 658.) In such a case, we "generally should direct the Board to conduct a new parole-suitability hearing in accordance with due process of law and consistent with the decision of the court." (*Prather*, *supra*, 50 Cal.4th at p. 244.)

As Justice Moreno pointed out in his concurrence in *Prather*, however, the *Prather* court addressed only the first remand after a parole denial. (*Prather*, *supra,* 50

28

Cal.4th at p. 262 (conc. opn. of Moreno, J.).) Justice Moreno observed, "Should the Board on remand again deny parole, and the court again rule that the parole denial is unjustified, then a more drastic intervention, such as an outright order that the Board grant parole, may well be warranted. Of course even then, the Governor would still have the prerogative, pursuant to article V, section 8, subdivision (b) of the California Constitution, to review the decision." (*Ibid.*)

More drastic intervention is called for here in light of the Board's failure again to consider highly relevant suitability factors, its continued reliance on conjecture to deny parole to petitioner, and its indication that it will not duly consider petitioner's postconviction conduct in light of its inability to "test" his purported "domestic abuse" problem while he is in prison. To hold otherwise would be to subject petitioner to an indeterminate number of parole hearings until the Board appreciates and fulfills its constitutional duty, and would render our review pointless. (See *Lawrence*, *supra*, 44 Cal.4th at p. 1210 [stating that, while the "some evidence" standard "is unquestionably deferential," it "certainly is not toothless"].) Petitioner has already served four years since the Board's 2010 denial.[11] He is entitled to his freedom. Therefore, we order the Board to vacate its denial and immediately grant petitioner parole, which order shall be subject to review by the Governor.

## DISPOSITION

The petition for writ of habeas corpus is granted. We order the Board to vacate its denial and immediately grant petitioner parole, which grant shall be subject to review by the Governor.

---

[11] Petitioner has now served approximately 21 years in prison, when the matrix of base terms applicable to his base offense, second degree murder, rangers from 15 to 21 years. (Regs., § 2403, subd. (c); see *Stoneroad*, *supra*, 215 Cal.App.4th at pp. 617-621 [discussing the rules and practices regarding base terms, and potential for unconstitutionally disproportionate sentences].)

_____

STEWART, J.

We concur.

_____

KLINE, P.J.

_____

RICHMAN, J.

| Trial Court: | Contra Costa County Superior Court |
|---|---|
| Trial Judge: | Hon. Brian Haynes |
| Counsel for Petitioner: | Brandie Devall, under appointment by the Court of Appeal |
| Counsel for Respondent: | Kamala D. Harris |
| | Attorney General of California |
| | Jennifer A. Neill |
| | Senior Assistant Attorney General |
| | Claudia H. Amaral |
| | Supervising Deputy Attorney General |
| | Amber M. Wipfler |
| | Deputy Attorney General |